■ PHILIPPE-GUY E. WOOG, Appellant-Respondent, v FIDELITY BANK, NATIONAL ASSOCIATION, Respondent-Appellant.—Order of the Supreme Court, New York County (Carmen Beauchamp Ciparick, J.), entered on or about February 3, 1989, which, *inter alia,* denied plaintiff's motion for summary judgment and granted defendant's cross motion for an order of attachment, is unanimously modified, on the law, to the extent of granting plaintiff's motion and denying that branch of defendant's motion for an order of attachment, vacating the order of attachment and those decretal paragraphs relating thereto, and otherwise affirmed, with costs and disbursements payable to plaintiff.

Plaintiff Philippe-Guy E. Woog, a Swiss domiciliary, brought this action in August 1988 to secure the return of collateral delivered to defendant Fidelity Bank, National Association, a Pennsylvania entity, pursuant to a written guarantee by plaintiff of a $750,000 loan made by the bank.

Plaintiff executed the guarantee on March 27, 1987, and pledged as collateral his cooperative shares of an apartment on Fifth Avenue in exchange for defendant's extension of a $750,000 loan to Xouth, Inc., payable on September 1, 1987. Plaintiff allegedly owned 80% of Xouth's shares and was its chairman of the board of directors but not an employee or officer of the corporation.

Plaintiff expressly guaranteed payment of the amount under two debt installments: a promissory note dated March 27, 1987 by Xouth in favor of defendant (First Note) and a loan agreement dated March 27, 1987 between Xouth and defendant (First Loan Agreement). Section 6 of the guarantee provided for its automatic termination within 15 days of the

termination of the First Note and section 10, pertaining to "Amendments, Changes, Etc.", provided: "No term or provision of this Guaranty may be amended, changed, waived, discharged or terminated orally, but only an instrument in writing signed by the party against which enforcement of the amendment, change, waiver, discharge or termination is sought."

Nevertheless, on July 1, 1987, Xouth and defendant executed a Second Loan Agreement providing Xouth with an additional $500,000 for a bridge loan. This loan was consolidated with the initial $750,000 in the First Loan Agreement and the interest increased from prime rate plus 1% to prime rate plus 2%, retroactive to May 1, 1987, and the due date on payment extended also.

On October 2, 1987, defendant executed a Third Loan Agreement to Xouth in the amount of $300,000.

On December 12, 1987, Xouth delivered a new promissory note (Consolidation Note) in favor of defendant for $1,650,000, which consisted of the $750,000 (first loan), $500,000 (second loan) and $300,000 (third loan) and an additional $100,000, providing also for an extension of payment until January 1, 1988. The Consolidation Note also retroactively increased by 1% the rate of interest payable on amounts outstanding during the period of May 1, 1987 to June 30, 1987.

On April 30, 1988, Xouth's president, Donald Heller, sent plaintiff's attorney a draft prepared by defendant entitled "FOREBEARANCE AGREEMENT", to extend plaintiff's warranties to cover all indebtedness and obligations to Xouth, and requested plaintiff's signature. On May 31, 1988, defendant forwarded to plaintiff's attorney a security agreement which contained a clause whereby plaintiff agreed to the prior modifications and amendments of the original guarantee. Plaintiff advised the bank of his intention not to execute the forebearance agreement and the security agreement and demanded the return of his coop stock certificate. Shortly thereafter, Xouth defaulted on the Consolidation Note and defendant demanded payment from plaintiff under the guarantee in the amount of $750,000 plus interest.

The IAS court denied both plaintiff's and defendant's cross motion for summary judgment "due to the existence of triable issues of fact that have been presented by defendant". Specifically, the court relied on defendant's evidence which demonstrated that plaintiff had posted $100,000 and $300,000 letters of credit in favor of defendant to secure the Second and Third

Loan Agreements to Xouth, which in turn allegedly encouraged defendant to extend plaintiff's time to make payment on the guarantee. The court, however, did grant defendant an order of attachment in the sum of $902,073.46, finding it probable that defendant would win on the merits and in view of the fact that plaintiff was a domiciliary of Switzerland.

"Under general contract rules, an obligation may not be altered without the consent of the party who assumed the obligation. Suretyship is a contractual relation and thus the rule is stated that the creditor and the principal debtor may not alter the surety's undertaking to cover a different obligation without the surety's consent. If they do so the surety is discharged because the parties have substituted a new contract, to which it never agreed, for the original" (*Bier Pension Plan Trust v Estate of Schneierson,* 74 NY2d 312, 315). Here, plaintiff executed a guarantee which unambiguously provided that its terms could not be amended except by a written instrument signed by the party to be charged. Several terms (i.e., maturity date, interest and liability) were changed without his express written consent.

Defendant's contention that plaintiff's conduct unequivocally demonstrates that he knew of and consented to the changes and that his relationship to Xouth should in and of itself be sufficient to raise an inference of knowledge and consent, because of his status as a principal shareholder of Xouth and his participation in obtaining several letters of credit which were preconditions for defendant extending further credit to Xouth, is without merit. *Fehr Bros. v Scheinman* (121 AD2d 13), cited by defendant, does not support its position. There, defendant guarantor, who remained as president and the majority shareholder of debtor corporation, changed the name and capital structure of the corporation in an unsuccessful attempt to discharge his obligation under the guarantee. Here, on the other hand, Xouth was not changed by plaintiff nor were the other changes initiated by him. Even assuming, arguendo, that the bank could rely on conduct of the plaintiff, where, as here, the guarantee expressly required written consent to changes, not acts or "conduct", it is apparent from the record that plaintiff posted security for the Second Note of the corporation *after* the execution of the Second Loan Agreement between the bank and Xouth. Thus, while it is true that plaintiff did obtain several letters of credit on behalf of Xouth, his conduct cannot be deemed to be a consent to an increase of his own personal liability under the guarantee.

Defendant, an experienced commercial enterprise, which provided itself with additional security by obtaining the guarantee from plaintiff and later requiring him to provide it with several letters of credit, could easily have required plaintiff, as a further condition of its extending more credit to Xouth, to execute an amendment of the guarantee. Defendant's attempt to do so came only after it was apparent that Xouth would default on $1.6 million under the Consolidation Note which superseded the first $750,000 loan backed by the pledged cooperative stock certificate.

Since we are granting plaintiff's motion for summary judgment, all of defendant's counterclaims must also be dismissed; each depends on the continued viability of the guarantee. Further, in view of this disposition, the order of attachment which was granted by the IAS court must be vacated. The Supreme Court did, however, properly deny defendant's cross motion to disqualify plaintiff's counsel. There was no showing that the attorney's testimony as the drafter of the guarantee was necessary to ascertain the intent of the parties (see, S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp., 69 NY2d 437, 445-446). Concur—Sullivan, J. P., Rosenberger, Asch, Ellerin and Smith, JJ.